IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

LETHCOE V. LETHCOE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KATIE LETHCOE, APPELLEE,

V.

TORY LETHCOE, APPELLANT.

Filed November 26, 2024.    No. A-24-072.

Appeal from the District Court for Sarpy County: NATHAN B. COX, Judge. Reversed and remanded with directions.

Aimee S. Melton and Megan E. Shupe, of Reagan, Melton & Delaney, L.L.P., for appellant.

Katie Lethcoe, pro se.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Tory Lethcoe appeals the decision of the Sarpy County District Court which modified but maintained an ex parte harassment protection order against him in favor of his wife, Katie Lethcoe. Tory argues that there was not sufficient evidence to support the order. He also argues that the district court incorrectly shifted the burden of proof to him. We find that there was not sufficient evidence to show a harassing "course of conduct." We therefore reverse the judgment of the district court and remand the cause with directions to vacate the harassment protection order.

- 1 -

## II. BACKGROUND

Tory and Katie were married in 2009 and had three children. Katie filed a complaint for dissolution of marriage on August 17, 2023. The parties continued to live together until Tory moved out of the family's home on December 1.

### 1. PLEADINGS AND EX PARTE ORDER

On December 15, 2023, Katie filed a petition and affidavit to obtain a harassment protection order against Tory on behalf of herself and the three minor children (ages 13, 11, and 8, according to the petition). The petition alleged that she and Tory had been or were currently involved in two other court cases together, a "divorce" and "contract." Katie alleged the following acts of harassment:

**A. 12/14/23 at 6:26 p.m.**

Tory was bringing [the youngest child] to the house after soccer practice. He was told the garage was open for [the child] to enter the house. Tory called Katie and said he was coming in and he has every right to come in the house based on his attorney. I let Tory know that he could not come in as I have to leave to pick up [the oldest child] from practice. We had predetermined he would not enter the property without notifying me and being given permission and that I would be home. He has his own residence . . . since December 1st. He then told me he was entering to see [the youngest child's] bedroom. I again told him no. I shut the door and locked it as he was trying to force open the door. He then told me he was calling law enforcement, as I had already dialed 911 to get assistance. He stayed in the garage and refused to move. I stayed on the line with the dispatcher and gave her information that [the oldest child] needed picked up from practice and I was unable to do so with Tory on property. At 6:40 Tory backed up his truck and began to leave. I went to shut the garage and he shouted out, "I'm leaving so you can pick up [the oldest child]." He did not leave the area as he went down the block to a neighbor's house. Once the sheriff showed up and I was talking with them, Tory came walking down the street to talk to them. At this point I went back in the garage away from him. He was told that he has no reason to enter the property and that if he needed belongings he needed to schedule a time to do so. Sarpy County Deputies completed the report. . . . Report is not available to the public at this time.

Tory then sent a text message at 6:24 a.m. on 12/15 stating he wanted to schedule a time this weekend to get the remainder of his belongings. A time had already been set up per previous messaging that 5:00 on 12/17 he could get the remainder of his things so there was no reason for him to contact me at 6:30 in the morning.

**B. 12/13/2023 at 9:40 p.m.**

Tory requested that we talk about Christmas again. I called him at 9:40 after I had the kids all in bed for the night. We disagreed on keeping traditions versus not keeping traditions. He was upset that he would not have extra time with them for the holidays as it was his parenting time anyways. I offered to allow him to keep the kids an extra 3 or 4 hours on Christmas Eve so they would come back with me around 8 or 9 p.m. He became angry and started screaming at me on the phone. He then told me I need to agree because otherwise it will cost us too much money in court. He wanted them on Christmas and told

me traditions need to change. I let him know that things need to stay consistent for the kids. After this point, I could not speak as he was screaming on the phone about how that is not the way it is going to be and that the kids need to have new traditions. At this point I said, "I am going to end this call as I do not need to listen to him scream at me." I repeated this three times before hanging up the phone. He immediately called me back. I declined the call. I then sent a message stating I will not talk to him when he is screaming and that we can try communicating again tomorrow. He continued to message and I repeated, "We can try again tomorrow" two more times.

### C. 12/12/2023 at 7:51 p.m.

Tory has been using text messaging and contact to harass me while I have the kids. I have communicated that he may not contact me during work hours and that I can have conversations with him after the kids go to bed so this doesn't interfere with the kids. On 12/12/23 he contacted me at 7:51 p.m. stating he wanted to discuss Christmas. This was an issue already discussed and established. I copied and pasted a previous text message that showed what we had already discussed. He then said we did not agree on that. I stated we can discuss when I am not with the kids. He stated that I never want to talk. I stated that kids need to keep traditions as that is what they have done and keep things normal for them. I then asked Tory to stop texting. He continued texting six more times after I asked him to stop. Text messages are included in affidavit supplemental.

He then sent text messages again on Wednesday morning after he was told not to text me while I am at work asking to talk and about kid activities. Kid activity details have already been discussed and agreed upon prior to these texts.

Tory only texts when it is my parenting time with the kids and only wants to discuss matters about custody during that time.

### D. 12/10/2023 at 4:45 p.m.

Tory stated that he needed to get his things from the house. I allowed this as we were transitioning the kids from his apartment to my house. He kept saying more that he wanted and I told him that it was not agreed upon. He ended up storming out of the house in front of the kids. I messaged him to see why he stormed off.

### E. Ongoing Sexual advances to manipulate situations

Tory has made numerous comments verbally about my physical appearance as well as sending text messages. He did hit my butt and when I told him that was not appropriate, he stated, "Well I am human." He asked to have intercourse and said we should as it may be a long time for both of us. I have made it very clear this is not appropriate nor do I have any interest. He continued even though this was communicated clearly.

(Emphasis in original.) Five pages of text messages were also included in Katie's petition and affidavit.

The same day that Katie's petition was filed, the district court entered an ex parte harassment protection order against Tory in favor of Katie and the children. Tory was enjoined from imposing any restraint upon the person or liberty of the protected parties; harassing, threatening, assaulting, molesting, attacking, or otherwise disturbing the peace of the protected parties; or telephoning, contacting, or otherwise communicating with the protected parties. The

order stated that Tory could request a hearing to "show cause why this order should not remain in effect for a period of one year."

On December 19, 2023, Tory filed a "Motion and Affidavit for Ex Parte Reconsideration of Ex Parte Order." He alleged the following. Katie filed a complaint for dissolution on August 17. She filed a motion for temporary orders on December 6, pleading for joint legal and joint physical custody of the children; the hearing was scheduled for January 17, 2024. The parties had shared joint custody on a week-on-week-off basis since Tory moved out of the marital residence. The parties were attempting to reach an agreement regarding the Christmas holiday parenting time; there were emails between counsel on December 14, 2023. Katie told Tory that she should have the children every Christmas Eve and Christmas Day and if he would not agree to her requested parenting time for Christmas, she would file a protection order. On December 15, Katie filed for and was granted an ex parte protection order, and no exceptions were granted for parenting time or contact regarding the children; Katie did not allege any harassment or harm to the children. Tory had not yet been served with the protection order, but his counsel found the protection order on JUSTICE. Tory believed that Katie filed solely for the purpose of having the children over Christmas Eve and Christmas Day. Tory asked the district court for an order vacating the ex parte harassment order and scheduling the matter for an evidentiary hearing, or, in the alternative, vacating the order to the extent of excluding the minor children and scheduling the matter for further hearing. That same day, the district court overruled and denied Tory's motion, indicating that Tory could "file a request for hearing for the Court to address the issues raised." The next day, Tory filed a request for hearing.

## 2. SHOW CAUSE HEARING

A show cause hearing was held on January 4, 2024. Katie and Tory both appeared with counsel. Upon questioning by the district court, Katie affirmed that the contents of her petition and affidavit were true. The court then admitted Katie's petition and affidavit into evidence.

Before proceeding with his defense, Tory moved to dismiss the case "for the reasons that taking this affidavit and everything as true at this point in time, nothing in the four corners of this affidavit rises to the level of harassment," "there is no course of conduct here even alleged that rises to the level of harassment." In response, Katie argued that "the allegations as set forth in the affidavit clearly show that [she] felt that [Tory] was engaging in a course of conduct that was designed to intimidate her," and "[i]t was a repeated pattern of conduct over a short period of time." The district court overruled Tory's motion to dismiss and the hearing proceeded.

Katie confirmed that she filed a complaint for dissolution of marriage in August 2023; the complaint was received into evidence. In the complaint for dissolution, Katie requested joint legal and sole physical custody of the parties' children. The parties continued to live together until December 1, when Tory moved out of the home. Beginning December 1, the parties exchanged the children on a week-on-week-off basis. In her motion for temporary order filed on December 6 (also received into evidence), Katie sought joint legal and joint physical custody of the children.

(a) Communication About Christmas - December 12 and 13, 2023

According to Katie, before December 1, 2023, she and Tory had reached an agreement about Christmas parenting time. Katie was asked about Tory's December 12th text message inquiring about Christmas. That text message exchange, found in exhibit 8, was as follows.

Tuesday, Dec 12 [] 7:51 PM

[Tory:] We also need to figure out how we're splitting up Christmas.

[Katie:] How about you get them the night before Christmas Eve. They wake up with you and do Christmas then I get them at 5 that night. Then they spend the night with me and I get them on Christmas and they go with you at 5 that night. Then we see them on both days. Same amount of time and we each get an overnight.

Already discussed above. Copied and pasted. Spending time with kids. Will talk later. . . .

[Tory:] We never agreed on the above. And no. That is not even time. Christmas [E]ve evening and most of Christmas day with you is not even close.

[Katie:] You did agree on it above. It is the same amount of time. Not talking about it now. With kids like I said[.]

[Tory:] You never want to talk about any of this.

[Tory:] If you think that it is so fair, then lets [sic] switch.

[Katie:] Traditions are being kept. I'm done talking about it. Talk to me when you have kids and waste your time not mine. You always want to interfere with my time with them. Stop texting.

[Tory:] Traditions will have to change. We can rotate holidays. I cant [sic] make everyone wait another week to make plans because you don't want to talk about it.

[Tory:] I say that we come up with a couple of options and ask the kids for their opinion.

Katie did not feel there was a need to keep revisiting the issue. When asked if Tory ever gave her a different proposal for Christmas parenting time for 2023, Katie replied, "He did not."

The parties again discussed Christmas parenting time over the phone on December 13, 2023. Katie testified, "[Tory] was screaming at me." According to her petition and affidavit, she ended the call, and then sent him a message stating that she would not talk to him when he was screaming and that they could speak again the next day, but he continued to message her. The relevant text message exchange, found in exhibit 8, was as follows:

Wednesday, Dec 13 [] 9:47 PM

[Katie:] I will not talk to you when you scream at me and cut me off. I do not have to put up with that anymore. We can try again tomorrow.

[Tory:] I did not scream at all. Stop acting like I am. Why are you doing this?

[Katie:] We can try again tomorrow.

[Tory:] Disagreeing with you is not screaming.

[Katie:] We can try again tomorrow. Good night[.]

[Tory:] Okay.

Katie was asked, "So at this point you had disagreed on December 13th about the Christmas holiday; correct?" She responded, "He had gone back on what we wanted originally."

Tory testified that the parties "never agreed to holiday visits." He also pointed out that "Christmas is also my birthday"; this is where part of the disagreement came from regarding holiday parenting time. Tory attempted to text Katie and tried to go through their attorneys to figure out the holiday. Tory denied ever yelling at Katie over the phone.

(b) Attempted Entry Into Home - December 14, 2023

On December 14, 2023, Tory returned the parties' youngest child to Katie after the child's activity. When asked if Tory tried to force his way into the house, Katie replied, "He did." Katie felt "[u]nsafe, scared." She said, "I felt like I needed to protect my kids. They were my first concern." Katie needed to pick up the parties' oldest child. "I found [the child] a ride from another parent as I was on the phone with dispatch." Tory "went down the street" and "[w]hen I was speaking to the sheriff, he comes walking towards the house." Katie confirmed that law enforcement spoke with both parties and ultimately asked Tory to leave.

The district court engaged Katie in the following colloquy about the December 14, 2023, incident.

> THE COURT: . . . [Y]ou allege that he -- that there was an agreement that he could only come on the premises with your permission; is that correct?
>
> [Katie]: Correct.
>
> THE COURT: And can you describe what he did in his attempt to force entry into the home after that point?
>
> . . . .
>
> [Katie]: He was pushing open the garage door on me, so I shut it and locked it on him.
>
> THE COURT: Now, when you say garage door, there are vertical doors that go up and down, and then there are side doors that are regular doors; which door are you talking about?
>
> [Katie]: Regular door.
>
> THE COURT: Okay. So where were you with relation to him at this juncture?
>
> [Katie]: On the other side of the door.
>
> THE COURT: Okay. And he is doing what?
>
> [Katie]: Pushing -- trying to push it open.
>
> THE COURT: Okay. And at this point, what had you communicated to him with regard to his ability to come in?
>
> [Katie]: I told him another time. He could not come in because I had to go get [the oldest child] from practice.
>
> THE COURT: Okay. All right. . . .

Tory also gave his version of the incident that occurred on December 14, 2023. Tory denied trying to force his way into the home or threatening Katie in any way. He testified that Katie called him when he was bringing the youngest child home, and she told him that he could send the child in through the garage door. However, the child had asked Tory to come in and see his room

"because he was very proud of how clean it was." Tory stated that when he pulled in the driveway, Katie was standing inside the garage door and told him to send the child in through the garage. Tory told Katie no, that the child wanted him to see his room and it would not take long. Tory said,

[S]he started screaming at me saying that she -- I'm not allowed in the house, and that I would have to do it another time. And I said, well, I talked to my attorney today, and you can't keep me from the house. We have nothing saying that I can't see my son's room. We have already talked about me not going in without her permission.

She continued to . . . scream at me. I never forced my way into the house. I was standing in the garage. She was in the doorway of our garage. She screamed at me, slammed the door, said she was calling the police. I said, well, we do need to call the police. When she slammed the door, I stood in the garage for maybe 10 seconds, and then I went outside where my truck was parked in the driveway and stood by my truck. I thought about leaving, but then she said she was calling the police, so I did not know whether I should stay or go. So I stayed there for a few minutes.

. . . .

Well, then my neighbor was outside, and I talked to my neighbor . . . for a while, and . . . we were going to watch a football game down the street, so I decided I would go home and get my football stuff, and then come back. And then I'm anticipating that the sheriff or somebody would be there so I could talk to them when I got back.

Tory confirmed that he sent a text message to Katie telling her that he was leaving. When he got back, he went to his neighbor's house. Later, "somebody mentioned the sheriff was down the street," "[s]o I walked down the street to talk to them." Tory confirmed that he was not given any citations.

The district court engaged Tory in the following colloquy.

THE COURT: . . . So it was communicated to you that she did not want you to come into the house prior to getting there; correct?

[Tory]: Yes, sir.

THE COURT: Okay. So with regard to the house, where did she meet you, if she met you at all, once you got to the house?

[Tory]: She was standing in the doorway inside of our garage.

THE COURT: Okay. So not inside the living quarters, but in the garage itself at the door?

[Tory]: Yes, sir.

THE COURT: Okay. Walk me through what happens step by step at that juncture?

. . . .

[Tory]: I was walking my son into the garage. I said, [he] wants me to see his room. It would take only a minute. And that's when she started screaming at me that I'm not allowed in the house, and that she's going to call the police.

THE COURT: Okay. So with regard to the door, is there any physical interaction with the door between the two of you at the garage?

[Tory]: No, sir.

. . . .

THE COURT: So you remained there with your son in the garage?

[Tory]: No, he went -- she had -- made him come in the house.

THE COURT: Okay. And what did you do then at that point?

[Tory]: She told me she was calling the police and slammed the door, so I was kind of perplexed as to what to do. So I stood there for a little bit, and then, like I said, I went to my truck and stood next to my truck waiting for the sheriff or police to show up.

. . . .

[Tory]: And that's when I talked to my neighbor.

THE COURT: But it's your position that she offered no physical resistance at either door during this encounter?

[Tory]: Other than slamming it -- slamming the door.

THE COURT: But did you physically come in contact with the door?

[Tory]: No.

THE COURT: All right. Thank you.

<br>

(c) Ongoing Sexual Advances

Katie was also asked about her allegations that Tory made ongoing sexual advances towards her. In her petition and allegation, Katie alleged that Tory "hit my butt and when I told him that was not appropriate, he stated, 'Well I am human.'" She also alleged that Tory "asked to have intercourse and said we should as it may be a long time for both of us"; "I made it clear this is not appropriate nor do I have any interest," and "[h]e continued even through this was communicated clearly." Katie's testimony established that both incidents--Tory hitting her butt and asking her to have intercourse--occurred while the parties were still living together, and "before" Tory moved out of the home on December 1, 2023. Tory testified that he "may have told [Katie] that she looked nice, but I never hit her backside." And he denied asking her to have intercourse.

There was also discussion about a "business card" text message Tory left for Katie after fixing her internet in December 2023.

Q [Tory's counsel]. . . . And how did you two meet?

A [Katie]. He was a Cox cable worker.

Q. Okay. And so you met, and he had left you a card -- a business card that had said, can I take you out for a drink; is that correct, when you met?

. . . .

[A.] Yes, that's how we met.

Text messages from December 2023, found in exhibit 8, read as follows:

Thursday, Dec 7 [] 5:45 PM

. . . .

[Katie:] Cox isn't working[.]

. . . .

[Tory:] . . . Do you want me to stop bye [sic] and look at it later?

. . . .

[Katie:] Okay Maybe this weekend. I'll deal without it tonight. I'm exhausted anyways. I was just going to work. Thanks[.]

. . . .

Thursday, Dec 7 [] 9:50 PM

. . . .

[Tory:] Do you want me to check the internet[?]

[Katie:] Up to you. Please take your shoes off.

[Tory:] Okay[.]

[Katie:] Thanks[.]

[Katie:] Let me know what you find out. I should be back in a bit.

. . . .

[Katie:] Please just wait for me for the internet.

[Katie:] I prefer being home. Makes me more comfortable.

[Tory:] Its [sic] fixed[.]

[Katie:] Thank you. What did you do?

[Tory:] Reset it[.]

An exchange from the next day read in part:

[Tory:] Hows [sic] the internet?

[Tory:] I was going to leave a business card with a note saying "call me if you want to get a drink sometime" but I wasn't sure if you'd appreciate it.

[Katie:] Good. Thanks. How are my babies?

[Tory:] Good!

Katie confirmed that the "business card" text was the one that upset her. When asked if Tory was trying to be funny, Katie responded, "No," "[t]his is a pattern of behaviors that continue." Tory testified that the text message about leaving a business card was him "just trying to joke around," "making reference to how we first met"; he met her while fixing her internet.

### (d) Other Testimony

It was noted that Katie repeatedly stated that she did not want Tory to text her when she had the children. However, she confirmed that there were times when she sent text messages to Tory when he had the children.

Katie confirmed that she put the children on the protection order. She was asked what in her petition alleged what Tory had done to harass the children. Katie responded, "It impacts the children." "It had to do with [the oldest child] that was in the petition," "[t]hat I was unable to go get her . . . because he would not leave the premises after requesting for him to go." Katie also testified that Tory "allowed the kids to hear the affidavit that was read," and "[h]e's doing a lot of these things and arguments in front of the children."

Katie's counsel asked her how all of this (i.e. the incidents on December 10, 12, 13, and 14, 2023, and the sexual advances) made her feel. Katie responded: "Unsafe, uneasy. Like I don't even feel comfortable out of my home because he has neighbors watching my home right now, and what I'm doing as well." Katie did not feel like her efforts to tell Tory to stop had been

successful. She denied filing for a protection order with the intention of preventing Tory from having Christmas parenting time.

(e) District Court's Findings and Modified Order

After both parties rested, the district court made oral findings on the record. The court said that it understood that the parties' communication "isn't the best, but I'm hoping that that can be addressed through the domestic case." The court's concern was the "sexual advancements" and "the situation that happened out in the garage." The court addressed the sexual advancements first. The court stated,

> First of all, as I'm understanding the evidence that has come in, those happened before the parties separated. I understand that there are disagreements, and there are interactions that married persons engage in, but I'm not finding that that is something the I should issue the protective order - - or a protective order involving those instances.

The court next addressed what happened in the garage.

> So what I'm finding is that there was an agreement or a communication between the parties, that [Tory] was not to come into the home without permission. . . . So the child makes a request to come in and look at the bedroom. It's nice and it's great, but the bottom line is you have no permission to go into the home at this juncture. And you may make distinction between the residence -- living residence and the garage, I don't think most jurisdictions do. If somebody breaks into a home and takes something from the garage, it's still a burglary.
>
> So with regard to that plane, you were informed that you were not to come in. You decided to force the issue with your child to go in. And so the Court with regard to that incident is going to find by a preponderance of the evidence, and credibility accordingly going to [Katie], that you were informed that you were not to come in, and you came in any way.
>
> . . . . I'm going to find that this was a knowing and willful course of conduct directed at a specific person, specifically, [Katie]. And that it constitute[s] a situation that seriously terrifies, threatens, and intimidates a person and serves no legitimate purpose. Forcing yourself into someone's home when you are aware that you have no right to go into the home fits that bill as far as the Court is concerned.

The court said it would order the harassment protection order to remain in place with regard to Katie. However, the court did not believe that Tory harassed the children and said it would modify the protection order to remove them.

The district court entered the modified harassment protection order in favor of Katie on January 4, 2024. The court ordered that the harassment protection order issued on December 15, 2023, would remain in effect for a period of 1 year from the date of the original order, as modified and restated in the following manner: (1) Tory was enjoined from imposing any restraint upon the person or liberty of Katie; and (2) Tory was enjoined from harassing, threatening, assaulting, molesting, attacking, or otherwise disturbing the peace of Katie. (However, Tory was no longer enjoined from telephoning, contacting, or otherwise communicating with Katie.)

- 10 -

Tory appeals.

## III. ASSIGNMENTS OF ERROR

Tory assigns that the district court erred by (1) affirming the ex parte harassment protection order where the evidence was insufficient to support such finding, and (2) placing the burden of proof on him at the show cause hearing.

## IV. STANDARD OF REVIEW

The grant or denial of a protection order is reviewed de novo on the record. *Diedra T. v. Justina R.*, 313 Neb. 417, 984 N.W.2d 312 (2023). In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Id.* However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## V. ANALYSIS

### 1. GENERAL PRINCIPLES OF LAW

We briefly review the law governing show cause hearings and harassment protection orders. A show cause hearing in protection order proceedings is a contested factual hearing, in which the issues before the court are whether the facts stated in the sworn application are true. *Id.* A protection order is analogous to an injunction, and a party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle that party to relief. *Id.* As such, the petitioner at a show cause hearing following an ex parte order has the burden to prove by a preponderance of the evidence the truth of the facts supporting a protection order. *Id.* Once that burden is met, the burden shifts to the respondent to show cause as to why the protection order should not remain in effect. *Id.*

Under Neb. Rev. Stat. § 28-311.09(1) (Cum. Supp. 2022), "[a]ny victim who has been harassed as defined by section 28-311.02 may file a petition and affidavit for a harassment protection order. . . ." Neb. Rev. Stat. § 28-311.02(2)(a) (Reissue 2016), in turn, defines the term "harass" to mean "to engage in a knowing and willful course of conduct directed at a specific person which seriously terrifies, threatens, or intimidates the person and which serves no legitimate purpose." And,

> Course of conduct means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including a series of acts of following, detaining, restraining the personal liberty of, or stalking the person or telephoning, contacting, or otherwise communicating with the person.

§ 28-311.02(2)(b). The language "seriously terrifies, threatens, or intimidates" is applied objectively, and "the evidence should therefore be assessed on the basis of what a reasonable person under the circumstances would experience." *Diedra T. v. Justina R.*, 313 Neb. at 423-24, 984 N.W.2d at 319. Thus, the inquiry is whether a reasonable person would be seriously terrified, threatened, or intimidated by the conduct at issue. *Id.*

The petition and affidavit shall be deemed to have been offered into evidence at any show-cause hearing. § 28-311.09(7). The petition and affidavit shall be admitted into evidence unless specifically excluded by the court. *Id.*

## 2. SUFFICIENCY OF EVIDENCE

Tory notes the district court specified that the protection order was affirmed based on the interaction between the parties in the garage on December 14, 2023. Tory argues that "[t]his one interaction does not meet the definition of harassment." Brief for appellant at 11.

Section 28-311.02(2)(b) expressly provides that harassment requires a course of conduct, which is defined in part as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." Further, the legislative intent articulated within § 28-311.02(1) is that the harassment protection statutes are meant to address "stalking offenses." *Knopik v. Hahn*, 25 Neb. App. 157, 163, 902 N.W.2d 716, 721 (2017).

Nebraska courts have found harassment protection orders to be appropriate when the perpetrator stalks, follows, detains, restrains, or otherwise harasses the victim on several separate occasions. *Id.* However, there were not several separate occasions of harassment in this case. The district court found, and we agree, that the parties' communication issues and Tory's "sexual advancements" did not support the issuance of a protection order in this case. We also note that Katie did not cross-appeal those findings of the district court.

The district court's sole basis for the protection order was "the situation that happened out in the garage." The court found that "there was an agreement or a communication between the parties, that [Tory] was not to come into the home without permission." The court also found Katie credible, in that "[Tory was] informed that [he] was not to come in, and [he] came in any way." The court found that "was a knowing and willful course of conduct directed at a specific person, specifically, [Katie]," "[a]nd that it constitute[s] a situation that seriously terrifies, threatens, and intimidates a person and serves no legitimate purpose."

Even assuming that a reasonable person would have been seriously terrified, threatened, or intimidated by Tory being in the garage or attempting to enter the home on December 14, 2023, there was not sufficient evidence to show that he engaged in a "course of conduct" intending to seriously terrify, threaten, or intimidate Katie with no legitimate purpose as required by statute.

In *Knopik v. Hahn, supra*, this court addressed whether a person's actions over a 10-to-20-minute span of time on one particular day constituted a "course of conduct" for the issuance of harassment protection orders. In that case, Hahn repeatedly yelled at his female neighbor because her dog was not on a leash, and he called her a profane name. When she turned around to walk away, Hahn followed her onto her property and continued to call her names. During the confrontation, Hahn punched the woman's fiance, who also lived at the residence. The district court issued harassment protection orders in favor of the woman and her fiance. Hahn appealed, primarily arguing that the conduct described did not fit within the statutory definition of "course of conduct." This court stated that the testimony offered at trial reflected the incident with Hahn occurred within a span of 10 to 20 minutes on one day, and there was no evidence of harassment prior to or after the confrontation. We found that "[w]hile Hahn's behavior was unsavory, it did not amount to a harassing 'course of conduct' as defined by § 28-311.02(2)(b) and applied through

precedent." *Knopik v. Hahn*, 25 Neb. App. at 162, 902 N.W.2d at 721. We reversed the lower court's issuance of protection orders.

The evidence in this case, based on Katie's testimony, was that Tory tried to push the door to the home open one time; in her petition and affidavit she said Tory "was trying to force open the door." She did not dispute that her son had asked Tory to come inside to see his room. Even if inappropriate, Tory's actions during this incident were not without legitimate purpose given his son's request. Tory testified that after Katie "slammed the door [and] said she was calling the police," he waited in the garage briefly, then stood by his truck in the driveway for a few minutes before leaving. We agree with Tory that this one interaction, even considered with the other evidence, did not constitute a "course of conduct" intended to terrify, threaten, or intimidate that served no legitimate purpose, as required to qualify as harassment. Therefore, we conclude that the evidence adduced at the show cause hearing was not sufficient to support the harassment protection order and we reverse the decision of the district court.

### 3. BURDEN OF PROOF

Because we have already determined that there was not sufficient evidence to support the harassment protection order, we need not address Tory's claim that the district court erred by placing the burden of proof on him at the show cause hearing. See *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

## VI. CONCLUSION

Based on our de novo review of the record, we find that there was not sufficient evidence to support the harassment protection order. We therefore reverse the judgment of the district court and remand the cause with directions to vacate the harassment protection order.

REVERSED AND REMANDED WITH DIRECTIONS.